IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

BONNIE ALLISON,                     )
                                    )
        Plaintiff,                  )
                                    )
v.                                  )        No. 05-2743-JPM
                                    )
REGIONS FINANCIAL                   )
CORPORATION,                        )
                                    )
        Defendant.                  )

---

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

---

Before the Court is Defendant's Motion for Summary Judgment (D.E. 126), filed October 17, 2008. Plaintiff responded on January 5, 2009 (D.E. 144). Defendant replied on January 15, 2009 (D.E. 156). The Court held a telephonic hearing on January 9, 2009 (D.E. 155). For the following reasons, Defendant's Motion is GRANTED IN PART and DENIED IN PART.

I.    Background

Plaintiff was employed by Defendant and its predecessors from 1981 until May 2005. (Compl. ¶¶ 5-19.) Plaintiff suffers from migraine headaches, urinary issues, bone spurs and a variety of other medical ailments which sometimes caused her to miss work. According to Defendant,

Plaintiff was terminated for insubordination, failure to work as a team player, and other conduct reasons. Plaintiff alleges, however, that she was terminated in retaliation for exercising her Family and Medical Leave Act ("FMLA") rights and on the basis of her disability.

In 2003 or 2004, Brenda Poole was promoted to manager and became Plaintiff's supervisor. (Decl. of B. Allison 3.)[1] Ginger Ricchetti was Poole's supervisor. (Poole Dep. 109.) Plaintiff believed that she should have been promoted instead of Poole; she told Poole she was unhappy with the promotion decision. (Allison Dep. 88-100.) Plaintiff felt that Poole was difficult to work with (Allison Dep. 87), singled her out, and was "hateful" to her (Decl. of B. Allison 3).

June 2004 Surgery

In May 2004, Plaintiff discussed with Poole her need to have time off for bladder surgery. On June 7, when her surgery date was finalized, she discussed the surgery with Poole again. (Allison Dep. 160-61.) Plaintiff advised Poole that the normal recovery period was four to six weeks but she would work from home after a few weeks if her doctor would allow it. (Id. at 161.) At Plaintiff's

_____
[1] There appears to be some dispute as to when Poole was promoted to a position higher than Plaintiff's position. (See Decl. of B. Allison 3; Allison Dep. 97.) For purposes of this motion, however, the dispute is not material.

2

request, Poole got Plaintiff a laptop so she could work from home.  (Id.)

Plaintiff had surgery on June 23, 2004.  On June 29, Poole called Plaintiff at home to ask when she could return to work.  (Id. at 165-66.)  Plaintiff told Poole that, according to her doctor, she needed total pelvic rest until her next doctor's appointment.  (Id.)  Plaintiff advised Poole that she was taking strong pain medications.  (Id. at 167.)  Poole asked Plaintiff to do work from home.  When Plaintiff asked if it needed to be done right away, Poole responded that Ricchetti wanted it done.  (Id. at 166.)  Based on this response, Plaintiff believed she would be fired if she did not complete the work, but no one told Plaintiff that she would be fired if she refused to do the work.  (Id. at 171-72.)

On June 30, both Poole and Ricchetti called Plaintiff.  (Decl. of B. Allison 8.)  Plaintiff also received emails from work during her time at home.  (Id. at 7 (citing Exs. W - OO).)  Plaintiff discussed FMLA leave with both Poole and Ricchetti.  Poole was unsure whether Plaintiff would be paid on FMLA leave and said she would check with Ricchetti.  (Allison Dep. 167.)  According to Plaintiff, Ricchetti called back once and said she would think about whether to put Plaintiff on FMLA leave or sick leave, then called back

again and advised Plaintiff she would be put on sick leave. (Id. at 168.) Ricchetti denies making these statements. (Ricchetti Dep. 79-80.) Ricchetti testified that she considered Plaintiff to be working from home, not on sick leave. (Id. at 81, 95-96, 145-46.)

On July 6, 2004, Plaintiff saw her physician for a follow-up visit. (Decl. of B. Allison 8.) Her physician offered to fax a note to Defendant that Plaintiff needed complete bed rest, but Plaintiff refused his offer because she thought she would get into trouble and because she felt no one else could do the work. (Allison Dep. 172-73.)

Plaintiff had another follow-up appointment on July 13, 2004. According to Plaintiff, Ricchetti asked her to come into work before her appointment (and before she was officially medically released to return to work) to attend a meeting. Later that day, Plaintiff asked her physician to release her to work because there were deadlines to meet and she felt she would lose her job if she did not return. (Id. at 173-74.) After her appointment, Plaintiff returned to work and provided Defendant with medical documentation verifying her surgery and explaining that Plaintiff needed total pelvic rest until July 14, 2004, when she could return to work. Defendant neither requested nor received any other documentation from Plaintiff's physician.

Plaintiff was paid for every day from June 23 to July 13, 2004. (Pl.'s Resp. to Facts 13.) She did not lose any accumulated sick time for absences during this period. (Poole Dep. 177; Ricchetti Dep. 80-81; Pl's Resp. to Facts 14.) Plaintiff never exhausted her sick leave. (Ricchetti Aff. ¶ 3.)

### August 19-20, 2004

Plaintiff has suffered from migraines since the late 1980s or early 1990s. Her migraines are induced by stress and anxiety. (Allison Dep. 330; Munn Dep. 10-14.) They occur approximately once per month. (Allison Dep. 330-31.) When Plaintiff has a migraine, she has to "stop everything, go home, get in bed, turn the lights out, turn the radio off, turn the TV off" and have total silence until it is gone. (Id. at 331.) Prior to 2005, Plaintiff did not take any prescription medications for her migraines. (Id. at 179.) Ricchetti testified that she knew Plaintiff had migraines, but denied knowing their severity. (Ricchetti Dep. 137.)

On August 19, 2004, Plaintiff left work at 9 AM because she had a severe migraine. (Allison Dep. 178; Decl. of B. Allison 10.) She told Poole she was leaving with a migraine. An email from Allison to Ricchetti and Poole on the morning of August 19 indicates that she is

"going home sick" because she did not sleep the previous night. (Pl.'s Resp. Ex. SS-1 (Doc. 150-6 at 3).) The migraine lasted for two days. She went home, turned the lights off, used over the counter pills and let the migraine run its course. (Allison Dep. 180.) Plaintiff's failure to answer Ricchetti's phone calls on August 19-20th was cited as a reason for her discipline in December 2004. (Regions Progressive Discipline Form (D.E. 126-4 118).)

### November 3, 2004: Appreciation Dinner

On November 2, 2004, Plaintiff worked until at least 3:00 AM (Decl. of B. Allison 9.) She returned to work at 6:51 AM the following day. (Id.) At 4:36 PM, she had a work-related conflict with Ricchetti. After a series of emails, Plaintiff got upset. She left work at 5:01 PM (Id.) There was an employee appreciation dinner that evening, which Plaintiff had planned to attend. (Allison Dep. 110-11.) She did not attend because she was tired and because she was upset about the conversation with Ricchetti. (Id. at 107.) Ricchetti contacted Plaintiff to find out why she was not at the dinner. (Decl. of B. Allison 9-10.)

### December Commitment to Correct

On December 10, 2004, Plaintiff met with Ricchetti, Bruce Livesay and a representative from Human Resources to

discuss her Commitment to Correct, a written document which is part of Defendant's progressive discipline policy.  The write-up states that the following situations would be discussed:  "insubordinate tone in emails and conversations with managers, which violates the Standards of Conduct Policy.  Using unprofessional leadership conduct in presence of peers and other co-workers.  Lack of responding to phone calls or messages when out of office.  Violating Notification process in Attendance Policy."  (Regions Progressive Discipline Form (D.E. 126-4 118).)  The form cites August 19-20, 2004 as days Plaintiff failed to respond to phone calls or messages when out of the office.  (Id.)  The Commitment to Correct did not result in a demotion or deduction in compensation.  (Pl.'s Resp. to Facts 22.)

### January 2005 Surgery

On January 18, 2005, Plaintiff had another surgery.  She requested and was approved for FMLA leave.  (Decl. of B. Allison 15.)  According to Plaintiff, Ricchetti called on January 19 to check on her.  On January 20, Poole called twice and left messages asking about a work-related issue.  When Plaintiff returned Poole's calls in the afternoon, she was heavily medicated.  (Id.)  On January 27, Plaintiff called work to inform her supervisors that the doctor

extended her return to work date by one week.  Poole called

back and told Plaintiff's sister she would talk to HR about

the paperwork.  (Decl. of B. Allison 16; Aff. of Deloris

(Dee) Day (Pl.'s Resp. Ex. 3).)  Later the same afternoon,

Poole and Vanessa Pruit together called Plaintiff.  Poole

asked Plaintiff to participate in a conference call.

Plaintiff asked Poole to check with Ricchetti about whether

Plaintiff should participate while out on FMLA leave.  On

January 29, Poole called back and left a message telling

Plaintiff that Ricchetti informed her Plaintiff was not

supposed to participate in conference calls while on FMLA.

(Decl. of B. Allison 15-16; Allison Dep. 180-81.)

Plaintiff returned to work on February 3, 2005.

(Decl. of B. Allison 16.)

February - May 2005

In February 2005, Plaintiff informed her managers that

an MRI of her brain had revealed mini-strokes.  (Allison

Dep. 119-20.)  Her physician instructed her to normalize

her work schedule, but did not write a report of medical

limitations.  (Munn Dep. 16-17.)

On April 14, 2005, Plaintiff's then-attorney, Emma

Cole, responded to the December Commitment to Correct by

letter.  The letter focused on Plaintiff's FMLA rights.

(Mem. of Legal Op. re: Performance Discussion and Reprimand
(D.E. 150-9).)

Plaintiff continued to have bladder and urinary issues
in April 2005, and alleges that Ricchetti and Poole were
aware of these problems.  (Decl. of B. Allison 13.)  On
April 21, 2005, Plaintiff notified Poole and Ricchetti that
she was on a new medication which made her sleepy.
Plaintiff informed her supervisor that the medication might
inhibit her ability to multitask.  Poole responded asking
whether Plaintiff needed FMLA and telling Plaintiff to let
Defendant know if the situation changed.  (Allison Dep.
125-26, 245-46 and Ex. 19; Poole Dep. 137, 177-78.)
Plaintiff also informed Defendant that she would need to
work normal hours; she did not provide medical
documentation to support her request.  (Allison Dep. 122-
128.)  Plaintiff's Declaration states that she planned to
get a medical report of her restrictions at her next
appointment, scheduled for May 25, 2005.

Plaintiff told Vanessa Pruit, the Project Manager,that
she could not work the same hours on the current project
she had worked on the previous project.  (Decl. of B.
Allison 13.)  According to Plaintiff, she did not mean to
be disrespectful; she simply wanted her managers to know
that she could not work long hours because of her health.

<u>May 2005</u>

On or about May 6, 2005, Plaintiff's coworker, Heather Gaddy, told Ricchetti that she had concerns about Plaintiff's role on the team. (Ricchetti Dep. Ex. 28.) Gaddy and other coworkers emailed their comments to Ricchetti on May 10 and 11, 2005. (Ricchetti Dep. 219-20 and Ex. 28 (email correspondence from Heather Gaddy, Kristopher Bridges and Vanessa Pruit).) Terry Standridge testified that he complained to Ricchetti that Plaintiff was being "verbally abusive" and sent emails that criticized his work. (Standridge Dep. 40-41.) Standridge reports sending Ricchetti an email complaining about Plaintiff's behavior, but no email has been produced. (Decl. of B. Allison 4.) Plaintiff admits that she was "perceived as not being a team player." (<u>Id.</u> at 6.)

On or about May 12, 2005, Poole held a meeting in which she instructed Plaintiff and Standridge to attend a meeting about business analyst questions. Plaintiff commented that Poole knew more about the topic than Plaintiff and Standridge combined. Poole testified that the comment was inappropriate. (Poole Dep. 180-81.) Plaintiff testified that she meant the comment as a compliment about Poole's knowledge of the subject. (Allison Dep. 113-14, 156-57.).

On May 13, 2005, Plaintiff was terminated.  In making
the termination decision, Bruce Livesay relied on emails
and on the recommendations of his team, including Ricchetti
and Poole.  (Livesay Dep. 34-35.)  Livesay received a phone
call from HR stating that there had been another incident
involving Plaintiff, that Plaintiff had clearly violated
the terms of her December performance plan and that
Defendant was within its rights to terminate her.  (Id. at
114.)

Defendant cites several reasons for Plaintiff's
termination, including: insubordinate behavior, failure to
be a team player, inappropriate comments, failure to set a
good example as a team lead, and failure to comply with the
terms of her December 2004 performance plan.  (Livesay Dep.
113-18; Ricchetti Dep. 205-07; Regions Progressive
Discipline Form (D.E. 126-4 118).)

Plaintiff alleges that she was terminated in violation
of both the Family Medical Leave Act ("FMLA") and the
Americans with Disabilities Act ("ADA").  Defendant seeks
summary judgment on both claims.

    II.  Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), summary
judgment is proper "if the pleadings, the discovery and
disclosure materials on file, and any affidavits show that

there is no genuine issue as to any material fact and that
the movant is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett,
477 U.S. 317, 322 (1986).  So long as the movant has met
its initial burden of "demonstrat[ing] the absence of a
genuine issue of material fact," Celotex, 477 U.S. at 323,
and the nonmoving party is unable to make such a showing,
summary judgment is appropriate.  Emmons v. McLaughlin, 874
F.2d 351, 353 (6th Cir. 1989).  In considering a motion for
summary judgment, however, "the evidence as well as all
inferences drawn therefrom must be read in a light most
favorable to the party opposing the motion." Kochins v.
Linden-Alimak, Inc.,799 F.2d 1128, 1133 (6th Cir. 1986) see
also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475
U.S. 574, 587 (1986).

When confronted with a properly supported motion for
summary judgment, the nonmoving party "must – by affidavits
or as otherwise provided in this rule – set out specific
facts showing a genuine issue for trial." Fed. R. Civ. P.
56(e)(2); see also Abeita v. TransAm. Mailings, Inc., 159
F.3d 246, 250 (6th Cir. 1998).  However, "'[t]he mere
existence of a scintilla of evidence in support of the
plaintiff's position will be insufficient.'" Street v.
J.C. Bradford & Co., Inc., 886 F.2d 1472, 1479 (6th Cir.

1989) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

A genuine issue of material fact exists for trial "if the evidence [presented by the nonmoving party] is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In essence, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52.

III. Discussion

Plaintiff alleges that her termination interfered with her exercise of FMLA rights, in violation of 29 U.S.C. § 2615(a)(1), and was retaliation for her exercise or attempt to exercise FMLA rights, in violation of 29 U.S.C. § 2615(a)(2). She also alleges that Defendant terminated her because she is disabled, in violation of the ADA, 42 U.S.C. § 12101 et seq. Defendant seeks summary judgment on all claims.

Family and Medical Leave Act Claim

The FMLA entitles qualifying workers to take up to twelve weeks of unpaid leave for "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. ¶¶

2612(a)(1)(D), 2614(a)(1).  Employers are prohibited from interfering with the exercise of FMLA rights (29 U.S.C. § 2615(a)(1)) and from discharging or otherwise discriminating against an employee for opposing a practice made unlawful by the FMLA (29 U.S.C. § 2615(a)(2)).  In the Sixth Circuit, an employee's claim that she was terminated in retaliation for taking FMLA leave is cognizable under both the "interference" theory and the "retaliation" theory.  Wysong v. Dow Chemical Co., 503 F.3d 441, 446-47 (6th Cir. 2007).  Plaintiff asserts her FMLA claim under both theories.  (Pl.'s Resp. to Def.'s Mot. For Summ. J. 3.)

    FMLA: Interference Theory

    To prevail on an FMLA claim under the interference theory, an employee must establish, by the preponderance of evidence, that: (1) she is an eligible employee; (2) defendant is an employer; (3) the employee was entitled to FMLA leave; (4) the employee gave the employer notice of intent to take leave; and (5) the employer denied the employee FMLA benefits to which she was entitled.  Wysong, 503 F.3d at 447 (citing Cavin v. Honda of Am. Mfg., Inc., 346 F.3d 713, 719 (6th Cir. 2003)).

    Elements one and two of Plaintiff's interference claim are undisputed.  Plaintiff was an FMLA eligible employee

and Defendant was her employer.  (Def.'s Resp. to Requests
for Admission 1-2 (D.E. 144-3).)  With respect to
Plaintiff's June 2004 leave, elements three and four are
satisfied for purposes of summary judgment.  Plaintiff's
bladder surgery and recovery constituted a "serious health
condition" as defined in 29 U.S.C. § 2611(11).  Defendant
assumes, for purposes of summary judgment only, that
Plaintiff requested FMLA leave.  (Def.'s Mem. 2 n.1.)[2]

     With respect to Plaintiff's January 2005 leave, it is
undisputed that Plaintiff requested FMLA leave for this
period, satisfying element four.  Both Plaintiff and
Defendant believed Plaintiff was on FMLA leave at the time.
In the hearing on this motion, however, Defendant
questioned whether Plaintiff was entitled to FMLA leave
because, according to Defendant, the January 2005 surgery
was elective.  (See Def. Reply 23 n.12.)  Plaintiff has
satisfied her burden to present sufficient evidence from
which a jury could reasonably conclude that she was
entitled to FMLA leave for her January 2005 absences.

---

[2] The Court notes that an employee "need not invoke the FMLA by name in
requesting leave for an FMLA-qualifying reason." Plant v. Morton
Intern., Inc., 212 F.3d 929, 935 (6th Cir.2000).  The employee need
only provide the employer with information "sufficient to reasonably
apprise it of the employee's request to take time off for a serious
health condition."  Moorer v. Baptist Mem'l Health Care Sys., 398 F.3d
469, 488 (6th Cir. 2005).  It is the employer's duty to request
additional information if it feels it cannot determine whether the FMLA
encompasses the requested leave.  Plant, 212 F.3d at 935.

The remaining issue is whether a reasonable jury could conclude that Defendant denied Plaintiff an FMLA benefit to which she was entitled (the fifth element). An employee is denied her FMLA benefits where the employer "takes an employment action based, in whole or in part, on the fact that the employee took FMLA-protected leave." Wysong, 503 F.3d at 447.

The employment action at issue in this case is Plaintiff's termination.[3] Ricchetti testified that Plaintiff's termination was based, in part, on concerns expressed in emails from coworkers. (Ricchetti Dep. 218-223 and Ex. 28.) One of the coworker emails cited by Defendant included the following statement from Vanessa Pruit: "Bonnie has missed a total of 30 business days of this project, which amounts to 1/3 of the project. Her

---

[3] Defendant's calls and emails during Plaintiff's June 2004 and January 2005 leaves are not independently cognizable as FMLA violations because they did not result in "actual monetary loss." Spurlock v. Postmaster General, 19 Fed. Appx. 338, 340 (6th Cir. Sept. 17, 2001); Williams v. Toyota Motor Mfg., Ky., Inc., 224 F.3d 840, 844-45 (6th Cir. 2000), cert. granted on other grounds, 121 S. Ct. 1600 (2001). Defendant's actions during these periods may, however, be used as evidence that Plaintiff's termination was motivated by her exercise of FMLA rights. Similarly, Plaintiff's December Commitment to Correct does not form the basis for an independent FMLA claim because it did not directly result in damages. It is undisputed, however, that Defendant relied on the December disciplinary action in making its decision to terminate Plaintiff. (Regions Progressive Discipline Form (D.E. 126-4).) If the December Commitment to Correct was motivated by retaliatory animus, Plaintiff's termination could have resulted, in part, from retaliation for attempting to exercise FMLA rights. See Wysong v. Dow Chemical Co., 503 F.3d 441, 448 (6th Cir. 2007) (causation established by "unbroken chain of events" between considering employee taking FMLA leave and termination).

absence in this project has negatively impacted the team .
. . ." (Email from Vanessa Pruitt to Ricchetti, dated May
11, 2005, Dep. of Ricchetti Ex. 28.)  Ricchetti forwarded
Pruitt's email to Livesay and others with the following
message: "This feedback is from Vanessa Pruitt who is the
project manager for the Fidelity MSP move to Montgomery.
Also, I asked Brenda to give a breakdown of the days that
Bonnie has been out." (Email from Ricchetti to Livesay and
others dated May 11, 2005, Dep. of Ricchetti Ex. 28.)

The references to Plaintiff's absences in emails
relied upon as part of the termination decision is evidence
that Defendant used Plaintiff's absences, including her
FMLA absences, as part of the decision to terminate her.
See Cavin v. Honda of America Mfg., Inc., 346 F.3d 713, 727
(6th Cir. 2003) ("[A] termination based only in part on an
absence covered by the FMLA, even in combination with other
absences, may still violate the FMLA."); Wojan v. Alcon
Laboratories, Inc., 2008 WL 4279365 at *5 (E.D. Mich. Sept.
15 2008) (summary judgment for defendant denied where
plaintiff's total absences, including her FMLA absences,
were considered as part of the performance score used in
her termination).  Combined with Plaintiff's other
evidence, discussed in more detail in the retaliation
section (below), there is a genuine issue of material fact

as to whether Defendant denied Plaintiff FMLA rights to which she was entitled.

Accordingly, Defendant's motion for summary judgment on Plaintiff's FMLA claim under the interference theory is DENIED.

<u>FMLA: Retaliation Theory</u>

In the absence of direct evidence of retaliation, the Court applies the <u>McDonnell Douglas</u> burden shifting framework to FMLA claims brought under the retaliation theory. <u>Skrjanc v. Great Lakes Power Serv. Co.</u>, 272 F.3d 209, 315 (6th Cir. 2001). To succeed on an FMLA claim based on retaliation, Plaintiff must first establish by the preponderance of evidence that: (1) she was engaged in an activity protected by the FMLA; (2) her employer knew that she engaged in the protected activity; (3) the employer took an adverse employment action against her; (4) there was a causal connection between the protected activity and the adverse employment action. <u>Killian v. Yorozu Auto. Tenn., Inc.</u>, 454 F.3d 549, 556 (6th Cir. 2006).

For purposes of summary judgment, the first three elements of Plaintiff's claim are undisputed. Plaintiff took FMLA leave in June 2004[4] and January 2005[5] and that her

---

[4] <u>See</u> <u>supra</u> p. 16.
[5] <u>See</u> <u>supra</u> pp. 16-17.

attorney sent a letter regarding her FMLA rights in April 2005. Defendant knew about these activities. Plaintiff's termination is an adverse employment action.

The remaining issue is whether there was a causal connection between any of Plaintiff's FMLA activities and her termination. Defendant's reference to Plaintiff's absences as part of the termination decision is alone sufficient to create a triable issue of material fact on the issue of causation. See EEOC v. Avery Dennison Corp., 104 F.3d 858, 861 (6th Cir. 1997) (Plaintiff's burden to establish prima facie case is not onerous).

Once Plaintiff establishes her prima facie case, the burden shifts to Defendant to show a legitimate, nondiscriminatory reason for the adverse employment action. Ang v. Proctor & Gamble Co., 932 F.2d 540, 548 (6th Cir. 1991). Defendant satisfies its burden by pointing to Plaintiff's insubordination, complaints from coworkers, failure to work as a team player, and failure to perform according to the December disciplinary plan.

The burden then shifts back to Plaintiff to show that Defendant's proferred reasons were pretextual. Plaintiff can show pretext by showing that the reasons "either (1) had no basis in fact, (2) did not actually motivate his [termination], or (3) were insufficient to motivate his

[termination]." Coburn v. Rockwell Automation, Inc., 238
Fed. Appx. 112, 120-21 (6th Cir. 2007).  Plaintiff attempts
to show pretext of the second type, which requires
presenting circumstantial evidence tending to prove "that
an illegal motivation was *more* likely than that offered by
the defendant."  Manzer v. Diamond Shamrock Chemicals Co.,
29 F.3d 1078, 1084 (6th Cir. 1994).

The explicit reference to Plaintiff's absences in
emails about the termination decision is evidence tending
to prove that Plaintiff's termination was motivated by
retaliation.  The temporal proximity between the letter
from Plaintiff's attorney and her termination (one month)
is additional evidence of pretext.  Furthermore, Plaintiff
presents evidence of Defendant's negative attitude toward
her FMLA rights: Defendant's alleged refusal to classify
Plaintiff's June 2004 leave as FMLA leave; subjecting
Plaintiff to work-related demands throughout her June 2004
leave; and asking Plaintiff to come into work for a meeting
in July 2004, before she was medically released to do so.[6]

---

[6] The Court notes that other evidence relied upon by Plaintiff is not
evidence of pretext.  For example, Ricchetti's phone calls and emails
on November 3, 2004, asking Plaintiff why she was not at the
appreciation dinner, are not evidence of a retaliatory motive.
Plaintiff was not on FMLA leave at that time and did not attempt to
exercise any FMLA protected right.  Similarly, evidence that the
December 2004 Commitment to Correct was based, in part, on Plaintiff's
failure to answer phone calls while home with a migraine in August 2004
is not evidence of pretext because Plaintiff was not exercising or
attempting to exercise an FMLA right at that time.  Furthermore,

The Court finds that Plaintiff has presented sufficient evidence to permit a reasonable fact-finder to conclude that Defendant's proffered reasons for terminating Plaintiff were pretextual. Viewing the evidence in the light most favorable to Plaintiff, the Court cannot conclude as a matter of law that her termination was not motivated by retaliation for exercising her FMLA rights. Accordingly, Defendant's Motion for Summary Judgment on Plaintiff's FMLA claim under the retaliation theory is DENIED.

### Americans with Disabilities Act Claim

Plaintiff alleges that she was terminated because she is disabled, in violation of the ADA. (Pl.'s Resp. 19.) She does allege failure to accommodate. (Id. at 24.)

To succeed on her ADA claim, Plaintiff must first prove a prima facie case of discrimination by showing that (1) she is a disabled person under the ADA; (2) she is qualified, with or without reasonable accommodation, to perform the essential functions of the job; and (3) Defendant terminated her employment because of her

---

evidence that Ricchetti and Poole contacted Plaintiff during her January 2005 leave is not evidence of pretext. Plaintiff presents no evidence that she was forced to work during that time or threatened with retaliation if she refused to work. In fact, when she asked whether she was required to participate in a meeting while on leave, she was instructed that she should not participate because she was on FMLA.

disability.  Gantt v. Wilson Sporting Goods Co., 143 F.3d
1042, 1047 (6th Cir. 1998).

There is no dispute that Plaintiff was qualified for
her position, satisfying element two of her prima facie
case.  With respect to causation, Plaintiff has presented
evidence that her December 2004 discipline was based, in
part, on her failure to answer phone calls while she was
home with severe migraines on August 19 and 20, 2004.
(Union Planters Corp. Performance Discussion Documentation
(D.E. 126-4).)  She has also presented evidence that her
termination was based, in part, on her December 2004
discipline.  (Regions Progressive Discipline Form (D.E.
126-4).)  Although Plaintiff points to several physical
impairments other than migraines as contributing to her
alleged disability, she presents insufficient evidence of a
causal relationship between her termination and any of the
other medical conditions (anxiety, mini-strokes, urinary
problems, arthritis, bone spurs, diabetes, etc.).  The
issue, therefore, is whether Plaintiff's severe migraine
headaches qualify as a disability under the ADA.

A disability is "a physical or mental impairment that
substantially limits one or more of the major life
activities."  42 U.S.C. § 12102(2)(A).  A person is
"substantially limited" in her ability to perform an

activity if she is "[s]ignificantly restricted" as compared to the "condition, manner, or duration under which the average person in the general population can perform" the same activity. 29 C.F.R. § 16530.2(j)(1)(ii). "Major life activities are those basic activities that the average person in the general population can perform with little or no difficulty," Linser v. State of Ohio, Department of Mental Health, 234 F.3d 1268 (Table) (6th cir. 2000), including "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working," 29 CFR § 1630.2(i).

Plaintiff argues that she is disabled because her severe migraines substantially limit her ability to think and concentrate.[7] (Pl.'s Mem. 19.) The Court disagrees. First, "concentration" is not a major life activity. See Linser, 234 F.3d 1268 (Table) (6th cir. 2000) (rejecting argument that migraines limited major life activity of concentrating because "[c]oncentration may be a significant and necessary component of a major life activity, such as working, learning, or speaking, but it is not an 'activity'

---

[7] Plaintiff points to recall, sleeping, communicating, urinating, sitting and standing as other major life activities which are substantially limited by her health. (Pl.'s Mem. 19-20.) These limitations are allegedly related to other medical problems. Her deposition testimony and memorandum in opposition to summary judgment indicate that thinking and concentrating are the activities affecting by her migraines.

itself"); <u>Boerst v. Gen. Mills Operations, Inc.</u>, 25 Fed.
Appx. 403, 406 (6th Cir. 2002) (<u>citing</u> <u>Doren v. Battle
Creek Health Care Sys.</u>, 187 F.3d 595, 597 (6th Cir. 1999)).
Second, Plaintiff has not presented evidence that her
ability to think was significantly restricted as compared
to the general population.  In a similar case, the Eastern
District of Tennessee concluded that a plaintiff whose
migraines occurred two to three times per week had not
established that she was substantially limited in her
ability to think.  <u>McDonald v. Potter</u>, 2007 U.S. Dist.
LEXIS 57983 at *96 (E.D. Tenn. Aug 7, 2007).  Although the
plaintiff in <u>McDonald</u> was "intermittently incapacitated" by
her migraines and forced to "lie down in the dark and miss
work," the court concluded that she had failed to present
evidence that her migraines "substantially limited her
ability to think compared to the average person in the
general population."  <u>Id.</u> at 95, 99-100.  The Court agrees
with the reasoning in <u>McDonald</u>.  Plaintiff's headaches
occur less frequently than those described in <u>McDonald</u> and
Plaintiff has not presented evidence comparing her ability
to think to the average person in the general population.

The Court concludes, therefore, that Plaintiff's
migraines do not qualify as a disability under the ADA.
With respect to Plaintiff's other illnesses and ailments,

the Court concludes that even if Plaintiff was disabled under the ADA, there is no evidence that Defendant used that purported disability in its decision to terminate her.

Accordingly, Defendant's Motion for Summary Judgment on Plaintiff's ADA claim is GRANTED.

IV.  <u>Conclusion</u>

With respect to Plaintiff's FMLA claim, Defendant's motion for summary judgment is DENIED.  With respect to Plaintiff's ADA claim, Defendant's motion is GRANTED.


So ORDERED this 27th day of January, 2009.


/s/ JON P. McCALLA
United States District Judge